### FLOE v. PLOWDEN.

No. 6283.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 3, 1951.

Decided Nov. 5, 1951.

William S. Hope, Charleston, S. C. (Hope & Willcox, Charleston, S. C., on the brief), for appellant.

Charles W. Waring and Robert McC. Figg, Jr., Charleston, S. C., for appellee.

Before PARKER, SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

C. G. Floe, as Administrator of the estate of Sarah Grady Theriault, deceased, brought a civil action to recover damages, for the sole benefit of William Theriault, husband of deceased under South Carolina Code of Laws 1942, Sections 411–412, for the alleged wrongful death of Sarah Theriault, who was killed in a collision between the automobile in which she was riding and a pick-up truck, driven by the defendant, Plowden. The jury returned a verdict for defendant and plaintiff has appealed to us.

The only question before us is whether there was sufficient evidence to justify the District Judge in submitting to the jury the question of whether deceased and Grady, her brother and the only other occupant of the Theriault car, were engaged in a joint or common enterprise.[1] We think this question must be answered in the affirmative and the judgment below affirmed.

■ The law of South Carolina, which is here controlling, seems to follow the law as it is generally applied. Apposite cases are Padgett v. Southern Railway Co., 219 S.C. 353, 65 S.E.2d 297; Neese v. Toms, 196 S.C. 67, 12 S.E.2d 859, 863; Long v. Carolina Baking Co., 190 S.C. 367, 3 S.E.2d 46; Funderburk v. Powell, 181 S.C. 412, 187 S.E. 742; Langley v. Southern Railway Co., 113 S.C. 45, 101 S.E. 286, 289. See, also, Atchison, Topeka & Santa Fe Railway Co. v. McNulty, 8 Cir., 285 F. 97, 100.

Mr. and Mrs. William Theriault lived just outside of the City of Charleston, where Mr. Theriault was employed. Some time before the fatal accident, Charles Grady, Mrs. Theriault's brother, who had previously lived at Woonsocket, Rhode Island, came to Charleston and at the time of the accident was living with the Theriaults. Grady had been out of work for some time and the main purpose of his coming to Charleston was to attempt to obtain employment in that locality. On August 16, 1950, Mrs. Theriault and Grady decided to go to Moncks Corner, about 30 miles North of Charleston, to see whether work could be obtained for Grady with the Berkshire Worsted organization. The trip was made in the Theriault Buick, and the fatal accident occurred on the return from Moncks Corner to Charleston.

Grady, who was severely injured in the collision, testified by deposition. From his evidence, which was quite hazy and inconclusive, we quote:

"Q. Now then, did you have occasion on August 16, 1950, to take any trip out of the City of Charleston? A. Yes, sir, I did.

"Q. Where did you go? A. I went to Moncks Corner, I believe that is the name of the place.

"Q. Well, now, after you left Moncks Corner, you then went in a generally Southern direction towards Charleston? A. That's right.

"Q. Do you know the route number that you took going there? A. I haven't the slightest idea what it was.

"Q. Well, it was the main highway between Charleston and Moncks Corner, was it not? A. I imagine so; I don't know.

"Q. You are not particularly familiar with those roads there, are you, Mr. Grady? A. Not at all. * * *
* * * * * *

"Q. What means of transportation did you use? A. Automobile.

"Q. Whose automobile was it? A. My sister and her husband's car.

"Q. Do you know which one had title to the car? A. I imagine it was in his

1. There was abundant evidence to show that negligence in the operation of the Theriault automobile caused or contributed to the accident.

name, that is the way we usually do those things.

"Q. Did you go in the automobile alone to Moncks Corner or was anyone with You? A. My sister was with me.

"Q. Just the two of you? A. Yes, sir.

"Q. And you two went from Charleston to Moncks *Corner*? A. Yes, sir.

\* \* \* \* \* \*

"Q. Who was driving at the time of the accident? A. I think I was.

"Q. Don't you know whether you were or not? A. Frankly, I do not.

"Q. You don't know whether you were driving? A. I can't say for sure.

"Q. You are not sure? A. No, sir.

"Q. It may be that your sister was driving insofar as you know? A. She could have been, though I question it.

"Q. But you are not prepared to say at this moment whether you were driving or your sister at the time of the accident? A. That's right.

"Q. Well, certainly one or the other was driving? A. That's right.

\* \* \* \* \* \*

"Q. And were you a licensed driver in Rhode Island at the time this accident happened? A. My Rhode Island license had expired at that time.

"Q. Do you have any license permitting you to drive, from any other State? A. Not at that time.

"Q. You were not licensed in South Carolina, certainly? A. No, sir."

We quote from the testimony of William Theriault:

"Q. Mr. Theriault, you say that the car was registered in your name? A. Yes, sir.

"Q. How long had you had it? A. About a year, sir.

"Q. And you had bought it here in Charleston? A. Yes, sir.

"Q. Did you buy it new or secondhand? A. Secondhand, sir.

"Q. And did you pay for it, or did your wife pay for it, or did both of you pay for it? A. I paid for it.

"Q. And did she drive it regularly? A. She didn't drive it, sir.

"Q. Not at all? A. I drove it.

"Q. Well, did she ever drive it? A. Once in a while.

"Q. You didn't use it to go to work in, did you? A. No, sir.

"Q. You walked to work, didn't you? A. Most of the time.

"Q. And when you were at work, she had the right to drive the car, didn't she? A. No, sir.

"Q. What? A. No, sir.

"Q. You prohibited her from driving the car? A. Right.

"Q. You did? A. Yes, sir.

"Q. And you let Mr. Grady drive it though? A. That is right.

"Q. Did you know Mr. Grady didn't have a driver's license? A. No, sir.

"Q. You didn't find out from him before you let him drive the car, although you prohibited your wife from driving it? A. That's right."

Theriault's evidence that he did not know that Grady had no driver's license is contradicted by Sheriff Hill who stated concerning an interview with Theriault shortly after the accident:

"Q. Did he (Theriault) tell you whether or not his brother-in-law was supposed to drive an automobile? A. He asked me could I tell who was driving, and I told him from what I saw in finding the lady in the car as I did, that whoever was with her was driving. And he said, well the man didn't have a driver's license and he would have thought his wife would have been driving. He was sure he didn't have a driver's license.

"Q. He thought his wife would be driving? A. He seemed to be under the impression that his wife was doing the driving because his brother-in-law, or whoever he was, didn't have a driver's license."

All this testimony seems to raise more questions than it settles. Was the prohibition against Mrs. Theriault driving the car real? In spite of the prohibition, how often did she drive it? Theriault first stated that she drove the car "Not at all."

Later he said she drove it "Once in a while." In answer to the question, "You let Mr. Grady drive it?", Theriault replied "That is right." Was this a general permission or merely one given on each separate request by Grady? Did Theriault actually know that Grady had no driver's license? If he did, would he be apt to let Grady drive the car?

Grady evidently regarded the Buick as a family car, for when asked: "Whose automobile was it?", he replied: "My sister and her husband's car," and he could only imagine title to the car was in Theriault.

Did Grady or Mrs. Theriault, or both, plan the trip to Moncks Corner? Did Grady rely on a general permission from Theriault for the fatal trip, or did he ask and receive permission from his sister? What measure of control over the car did Mrs. Theriault exercise on the trip? Did she actually do part of the driving? Grady could not remember, though it seems clear that Grady was driving at the time of the accident.

■ Theriault would be the sole beneficiary of any recovery in this suit. The jury could, of course, take this into consideration in appraising his testimony and in passing on his credibility.

Mrs. Theriault was the wife of the owner of the car, so she had at least some interest, if that word be used in a broad sense, in the car. See Neese v. Toms, supra; Langley v. Southern Ry. Co., supra. She was the sister of Grady, who apparently was driving. Again see Neese v. Toms, supra, mother and daughter; and Langley v. Southern Ry. Co., supra, the driver was plaintiff's nephew. Grady was utterly ignorant of the roads between Charleston and Moncks Corner. Apparently Mrs. Theriault knew them well. This lends color to the view that both Grady and Mrs. Theriault expected her to exercise control, and that she did exercise control, over the movements and the direction of the car. According to Grady, she may have done some of the driving. If the testimony of Sheriff Hill be believed as to his interview with Theriault, Mrs. Theriault must have had a driver's license. Clearly Grady had no license. In case of any trouble on the road, or if it seemed that a State officer might stop the car, the expedient practice would obviously be to let Mrs. Theriault take the wheel.

Finally, in this connection, the object of the trip was not one in which Mrs. Theriault had no concern. She was keenly interested in securing a job for her brother. He was living as a guest with the Theriaults (the jury might well infer as a non-paying guest) so it was to her economic advantage to get him employment.

■ In the light of all the evidence in this case, viewed under the applicable South Carolina law, we think the District Judge properly submitted to the jury the question of whether or not Grady and Mrs. Theriault were engaged in a common or joint enterprise.

The judgment of the District Court is affirmed.

Affirmed.